*No.*_ _ _ _ _ _ _ _ _ _

## UNITED STATES DISTRICT COURT

Eastern District of Pennsylvania

Criminal Division

## THE UNITED STATES OF AMERICA

vs.

JAMES STEVENS,
a/k/a "Ark Royal," and
ROBERT WELSH

**18 U.S.C. § 371 (conspiracy – 1 count)**
**18 U.S.C. § 666(a)(1)(B) (federal program bribery/soliciting – 1 count)**
**18 U.S.C. § 666(a)(2) (federal program bribery/offering – 1 count)**
**18 U.S.C. § 1951 (extortion – 1 count)**
**18 U.S.C. § 1341, 1346 (honest services mail fraud – 12 counts)**
**Notice of forfeiture**

_A true bill._

Filed in open court this _____ day,
Of _NOVEMBER_ A.D. 20 _22_

Clerk

Bail, $_____

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** _____ |
| | | |
| v. | : | **DATE FILED:** _____ |
| | | |
| **JAMES STEVENS,** | : | **VIOLATIONS:** |
| a/k/a "Ark Royal," | | 18 U.S.C. § 371 (conspiracy – 1 count) |
| **ROBERT WELSH** | : | 18 U.S.C. § 666(a)(1)(B) (federal program |
| | | bribery/soliciting – 1 count) |
| | : | 18 U.S.C. § 666(a)(2) (federal program |
| | | bribery/offering – 1 count) |
| | : | 18 U.S.C. § 1951 (extortion – 1 count) |
| | : | 18 U.S.C. § 1341, 1346 (honest services |
| | | mail fraud – 12 counts) |
| | : | Notice of forfeiture |

## INDICTMENT

## COUNT ONE

### (Conspiracy)

**THE GRAND JURY CHARGES THAT:**

### BACKGROUND

At all times material to this indictment:

1.      The Southeastern Pennsylvania Transportation Agency ("SEPTA") was a metropolitan transportation authority providing rail, trolley, and bus services to passengers within Philadelphia, Pennsylvania, and the surrounding counties, as well as service between the states of Delaware and New Jersey.

2.      SEPTA was an organization, and an agency of a state government, which received annual benefits in excess of $10,000, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other forms of federal assistance.

3. SEPTA and its employees, as well as the citizens of the Commonwealth of

Pennsylvania who fund the organization, had an intangible right to the honest services of SEPTA

management officials.

4. SEPTA had a written Ethics Policy that was provided to all employees.

Among other provisions, the policy stated as follows:

> [S]ince SEPTA is a an agency and instrumentality of the Commonwealth, it falls
> within the meaning of the "government" for purposes of Federal wire and mail
> fraud statutes. (18 U.S.C. §§ 1341 *et seq.*) As such, any Employee who by virtue
> of his/her conduct engages in a scheme or artifice to deprive SEPTA of its
> intangible right to "honest services" is subject to criminal prosecution under
> Federal law . . . . Employees must not use their SEPTA position for personal gain
> or advantage, whether directly for themselves, for their family or acquaintances. .
> . . Employees must not engage in conduct that constitutes or creates a conflict of
> interest with SEPTA.

5. Defendant JAMES STEVENS was employed by SEPTA as the Director of

the Video Evidence Unit. This position vested defendant STEVENS with actual and perceived

authority and influence over, among other things, SEPTA's pursuing, awarding, operating, and

maintaining contracts involving video surveillance equipment and related products and services.

6. Defendant ROBERT WELSH was the Chief Operating Officer and owner

of Spector Logistics ("Spector") and related companies, including Blue Zebra Marketing ("Blue

Zebra"). These companies provided, installed, and maintained video surveillance equipment for

public transportation systems.

7. On or about March 6, 2014, SEPTA and Spector executed the "Contract

for Maintenance Support Services for Vehicle Video Systems" (the "General Maintenance

Contract"). The General Maintenance Contract provided for SEPTA to pay Spector $4,583,342

for maintenance services for its video surveillance systems on its transportation system for a

period of five years, from on or about March 13, 2014, through February 28, 2019. The General

2

Maintenance Contract provided that SEPTA had the right to "terminate the Contract, in whole or in part, at any time by written notice to the Contractor."

8. The work that Spector performed under the terms of the General Maintenance Contract, along with additional and related services performed for SEPTA, provided defendant ROBERT WELSH and Spector with their primary source of revenue, as Spector did not have significant business outside of SEPTA.

9. During the time that the General Maintenance Contract was in effect, defendant JAMES STEVENS, as the Director of the Video Evidence Unit for SEPTA, exercised day-to-day control and authority on behalf of SEPTA over the operation of the General Maintenance Contract.

## THE CONSPIRACY

10. From in or about March 2014 to in or about July 2018, in Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendants

### JAMES STEVENS,
### a/k/a "Ark Royal," and
### ROBERT WELSH

conspired and agreed together to commit offenses against the United States, that is, to:

a. Knowingly devise and engage in a scheme with the intent to defraud the citizens of the Commonwealth of Pennsylvania, as well as SEPTA, of the right to defendant JAMES STEVENS' honest services in the business of SEPTA, in violation of Title 18, United States Code, Sections 1341 and 1346; and

b. Engage in Federal program bribery, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 666(a)(2).

3

## MANNER AND MEANS

It was part of the conspiracy that:

11.     Defendant JAMES STEVENS solicited and demanded from defendant

ROBERT WELSH a stream of personal benefits during the time that the General Maintenance

Contract was in force. Specifically, defendant STEVENS solicited and demanded, among other

things of value: thousands of dollars in regular cash payments; supposed charitable donations,

which defendant STEVENS kept for his personal benefit; tickets for concerts; regular meals and

drinks at restaurants and bars; money for SEPTA office holiday parties; hotel accommodations

and meals during the Pope's visit to Philadelphia; the hiring, at defendant WELSH's expense, of

administrative support personnel for the personal benefit of defendant STEVENS; and future

employment for defendant STEVENS with Spector after defendant STEVENS retired from

SEPTA.

12.     Defendant ROBERT WELSH gave these things of value to defendant

JAMES STEVENS with the intent to influence defendant STEVENS in defendant STEVENS'

capacity as a SEPTA official, and in exchange for defendant STEVENS, in his capacity as

Director of the Video Evidence Unit for SEPTA, performing, withholding, and influencing

official acts for the benefit of defendant WELSH.

13.     Defendant JAMES STEVENS accepted the stream of personal benefits

from defendant ROBERT WELSH, knowing that the benefits were given in exchange for

defendant STEVENS performing, withholding, and influencing official acts for the benefit of

defendant WELSH.

14.     The official acts that defendant JAMES STEVENS took, attempted to

take, and caused as part of this illegal relationship included the following:

4

          a.      Giving favorable treatment to defendant ROBERT WELSH and his companies in connection with the General Maintenance Contract and the contracting process with SEPTA, and ensuring that defendant WELSH and Spector maintained its General Maintenance Contract with SEPTA;

          b.      Helping defendant ROBERT WELSH obtain additional contracts and approvals of change orders from SEPTA; and

          c.      Helping defendant ROBERT WELSH and defendant WELSH's companies, including Spector and Blue Zebra, obtain contracts, by: 1) issuing "sole source" contracts, where SEPTA did not solicit other bidders; 2) providing defendant WELSH with confidential information concerning SEPTA's pricing so that defendant WELSH could submit the lowest bid; and 3) providing other information and assistance that would aid defendant WELSH in obtaining contracts with SEPTA.

15. Defendant JAMES STEVENS routinely told defendant ROBERT WELSH that SEPTA could terminate Spector's valuable General Maintenance Contract, which SEPTA had the right to do under the terms of the contract. Defendant STEVENS required that defendant WELSH provide him with things of value as requested by defendant STEVENS or risk losing the contract.

16. By performing official acts for defendant ROBERT WELSH in exchange for things of value, defendant JAMES STEVENS corrupted the contracting and bidding process and created an unfair competitive advantage for defendant WELSH. Defendants STEVENS and WELSH also deprived SEPTA and its employees, as well as the taxpayers who fund the organization, of their intangible right to the honest services of defendant STEVENS.

17.     During the course of the conspiracy, at the request of defendant JAMES
STEVENS, defendant ROBERT WELSH gave defendant STEVENS regular cash payments of
up to $3,600, often monthly, by withdrawing cash from his Spector bank account.

18.     To conceal the conspiratorial activity from SEPTA and other authorities,
defendant JAMES STEVENS, at times, communicated with defendant ROBERT WELSH
through a Spector email account that defendant STEVENS maintained on Spector's email server.
To further conceal this activity, defendant STEVENS used an alias for this email, namely, "Ark
Royal," at the address, arkroyal@spector.com. When using this email account and at other times,
defendant STEVENS also referred to himself as "AR," an abbreviation for "Ark Royal."

19.     Defendant ROBERT WELSH also obtained at his own expense for
defendant JAMES STEVENS a cellular telephone and cellular service, to the financial benefit of
defendant STEVENS, which allowed for private communications about the conspiracy.

20.     Defendant JAMES STEVENS maintained a "note" on his SEPTA cellular
telephone, under the heading, "AR tracking 2016," to track defendant ROBERT WELSH's 2016
cash payments to him. In addition to using his alias abbreviation for this scheme, "AR,"
defendant STEVENS further attempted to disguise the nature of this "note" by writing the
amount of the payment backwards. For example, defendant STEVENS wrote, "0003" to refer to
a $3,000 cash payment from defendant WELSH and "0063" to refer to a $3,600 cash payment.

21.     In or about early and mid-2018, when defendant JAMES STEVENS
determined that SEPTA should no longer use Spector for the General Maintenance Contract,
rather than simply cancelling the contract, defendant STEVENS helped arrange for Company G
to purchase assets of Spector and take over the General Maintenance Contract in a manner that
would result in continuing financial benefits for defendant ROBERT WELSH.

## OVERT ACTS

In furtherance of this conspiracy, defendants JAMES STEVENS and ROBERT WELSH committed and caused to be committed, in the Eastern District of Pennsylvania and elsewhere, the following overt acts:

1.    As defendant JAMES STEVENS solicited and demanded, defendant ROBERT WELSH made regular cash payments to defendant STEVENS, withdrawing funds from his Spector business bank account on or about the dates listed below. Those cash payments, included, but were not limited to, the following, each cash payment constituting a separate overt act:

a.    On or about January 29, 2015 -- $3,000

b.    On or about October 2, 2015 -- $3,000

c.    On or about November 6, 2015 -- $3,000

d.    On or about January 6, 2016 -- $3,000

e.    On or about February 3, 2016 -- $3,000

f.    On or about March 2, 2016 -- $3,600

g.    On or about April 8, 2016 -- $3,600

h.    On or about May 9, 2016 -- $3,600

i.    On or about June 6, 2016 -- $3,600

j.    On or about July 6, 2016 -- $3,600

k.    On or about August 4, 2016 -- $3,600

l.    On or about August 26, 2016 -- $3,600

m.    On or about October 18, 2016 -- $3,600

n.    On or about November 17, 2016 -- $3,600

o.   On or about December 1, 2016 -- $3,600

p.   On or about January 10, 2017 -- $3,600

q.   On or about February 3, 2017 -- $3,600

r.   On or about March 3, 2017 -- $3,600

s.   On or about April 7, 2017 -- $3,600

t.   On or about May 15, 2017 -- $3,600

u.   On or about June 1, 2017 -- $3,600

v.   On or about August 9, 2017 -- $3,000

w.   On or about October 6, 2017 -- $3,600

x.   On or about November 20, 2017 -- $3,600

2.     In or about March 2014, defendant ROBERT WELSH set up a Spector

email account that defendant JAMES STEVENS directed defendant WELSH establish for him

on Spector's email server.  Defendant STEVENS used this email account,

arkroyal@spector.com, to communicate with defendant WELSH, referring to himself as "AR."

3.     In or about March 2014, defendant ROBERT WELSH also purchased a

cellular telephone and cellular service for defendant JAMES STEVENS, which defendant

STEVENS used to communicate with defendant WELSH.

4.     On or about November 14, 2014, as defendant JAMES STEVENS

solicited and demanded, defendant ROBERT WELSH gave defendant STEVENS a check for

$1,200, made payable to a local restaurant, to help fund an annual office holiday party for

SEPTA employees.

8

5.    On or about August 19, 2015, defendant JAMES STEVENS approved an emergency procurement and contract for Spector in the amount of $61,992, to supply video surveillance equipment on SEPTA's vehicles for the 2015 Papal visit.

6.    On or about September 2, 2015, as defendant JAMES STEVENS solicited and demanded, defendant ROBERT WELSH gave defendant STEVENS a check for $3,000, made payable to a supposed charity and charity golf tournament, which defendant STEVENS used for his personal benefit.

7.    On or about September 21, 2015, defendant JAMES STEVENS approved a change order from Spector to increase the number of surveillance systems (from 24 to 28) for the Papal visit, increasing the cost to SEPTA and the payments to Spector by approximately $10,332.

8.    On or about September 28, 2015, as defendant JAMES STEVENS solicited and demanded, during the Pope's visit to Philadelphia, defendant ROBERT WELSH paid $160.85 as the remaining charge on his bills for three rooms at the Loews Hotel, which bills totaled $4,256.44. Also on this date, defendant WELSH paid approximately $471 for a meal for defendant STEVENS and other SEPTA employees at the Capital Grille in Philadelphia.

9.    On or about September 29, 2015, defendant JAMES STEVENS approved an invoice from Spector to SEPTA for $32,545 for work performed by Spector on the SEPTA contract to supply video surveillance equipment for the 2015 Papal visit, which resulted in SEPTA issuing and mailing a check, on or about October 29, 2015, in that amount to Spector.

10.    On or about November 24, 2015, as defendant JAMES STEVENS solicited and demanded, defendant ROBERT WELSH gave defendant STEVENS a check for

9

$1,000, made payable to a local restaurant, to help fund an annual office holiday party for SEPTA employees.

11.     On or about December 7, 2015, defendant JAMES STEVENS sent a memorandum to other SEPTA officials justifying his selection of Spector for a "sole source" contract valued at $65,435 for an "inward facing retrofit project" relating to the surveillance units that were part of the General Maintenance Contract.

12.     On or about February 29, 2016, defendant JAMES STEVENS approved an invoice from Spector to SEPTA for $24,397 for work performed by Spector on the SEPTA "inward facing retrofit project," which resulted in SEPTA issuing and mailing a check, on or about March 25, 2016, in that amount to Spector.

13.     In or about March 2016, after SEPTA began the process of contracting for new video surveillance systems on SEPTA's 231 Silver Line IV regional rail cars (the "Silver Line IV Contract"), defendant JAMES STEVENS arranged for an "emergency procurement" that limited the number of potential bidders for the project, including Spector on the list of bidders. The bidding process was sealed; SEPTA would award the contract to the lowest bidder. Defendants STEVENS and ROBERT WELSH committed the following additional overt acts, among others, in connection with the Silverline IV contract:

a.     On or about March 2, 2016, before SEPTA announced the sealed bidding opportunity, defendant JAMES STEVENS, via his secret "Ark Royal" email address, discussed pricing with defendant ROBERT WELSH, and even lowered defendant WELSH's pricing in his draft proposals.

b.     On or about March 18, 2016, defendant JAMES STEVENS, via his secret "Ark Royal" email address, provided defendant ROBERT WELSH with SEPTA's

10

confidential cost information for the Silver Line IV Contract. Defendant STEVENS wrote, "The SLIV project should come in at less than $1,455,000."

c.      On or about April 4, 2016, defendant JAMES STEVENS, via his secret "Ark Royal" email address, told defendant ROBERT WELSH that the general contractor he was working with to obtain this contract was bidding too high to get the contract and advised defendant WELSH to revise the bid, stating that, "Their number cannot be a penny more than what was estimated and thereafter proposed by you as their partner."

d.      On or about April 5, 2016, defendant JAMES STEVENS emailed defendant ROBERT WELSH with comments on the specifics of the general contractor's draft pricing plan for the sealed bidding process that defendant WELSH had shared with defendant STEVENS on his secret "Ark Royal" email address. Defendant STEVENS wrote, "Let him know that SEPTA will reject this price."

e.      On or about April 8, 2016, after the general contractor working with defendant ROBERT WELSH did not submit the lowest sealed bid, defendant JAMES STEVENS and others working for him in the Video Evidence Unit, determined that, based on alleged errors in SEPTA's bidding documents, the sealed bids needed to be cancelled and there should be a new bidding process.

f.      On or about May 9, 2016, after defendant ROBERT WELSH began working with a different contractor, defendant JAMES STEVENS helped approve that contractor as the winning bidder, even though it had not submitted the lowest sealed bid.

g.      On or about October 10, 2017, defendant ROBERT WELSH deposited into his Spector checking account at Bank of America a check from the general contractor for $16,884, which represented a portion of the approximately $525,082 that

11

contractor paid Spector from in or about June 2016, through in or about October 2017, for its work on the Silver Line IV contract.

14.    On or about April 27, 2016, via his secret "Ark Royal" email address, defendant JAMES STEVENS, emailed defendant ROBERT WELSH to urge him to "quickly . . . setup and establish Blue Zebra as an Equipment Source and Distribution entity" so that this new entity could obtain a contract to provide cameras for SEPTA's vehicles.

15.    On or about May 3, 2016, defendant ROBERT WELSH, through Blue Zebra, submitted a bid in response to a procurement announcement from SEPTA for 200 dome vandal resistant cameras. Blue Zebra bid $13,000; there were no other bidders.

16.    On or about May 20, 2016, as defendant JAMES STEVENS solicited and demanded, defendant ROBERT WELSH purchased four tickets for a Barbara Streisand concert at the Wells Fargo Center, at a cost of approximately $1,711, for defendant STEVENS.

17.    On or about June 28, 2016, in an email on his secret "Ark Royal" Spector email account, defendant JAMES STEVENS solicited and demanded of defendant ROBERT WELSH, that defendant STEVENS secure a position with Spector after defendant STEVENS retired from SEPTA. Defendant STEVENS made specific demands about this future position, including "AR commission SLIV," that is, an additional payment for defendant Stevens' favorable treatment of defendant WELSH and Spector on the "Silver Line IV" contract.

18.    On or about July 13, 2016, defendants JAMES STEVENS and ROBERT WELSH caused SEPTA to issue a check to Blue Zebra in the amount of $13,000 for work performed on the contract to provide the cameras.

19.    On or about September 8, 2016, as defendant JAMES STEVENS solicited and demanded, defendant ROBERT WELSH gave defendant STEVENS a check for $1,200,

12

made payable to a supposed charity and charity golf tournament, which defendant STEVENS used for his personal benefit.

20.    In or about November 2016, as defendant JAMES STEVENS solicited and demanded, defendant ROBERT WELSH gave defendant STEVENS approximately $1,000 in cash to help fund an annual office holiday party for SEPTA employees.

21.    On or about November 10, 2016, defendants JAMES STEVENS and ROBERT WELSH caused SEPTA to issue and mail a check for $9,750 to Blue Zebra as payment for cameras provided under the September 2016 eProcurement requisition for 300 dome vandal resistant cameras.

22.    On or about November 21, 2016, in an email to another SEPTA employee, defendant JAMES STEVENS approved the purchase of cameras from defendant ROBERT WELSH and Blue Zebra for a June 2016 procurement requisition for sixty 3.8 MM color video cameras.

23.    On or about February 17, 2017, defendants JAMES STEVENS and ROBERT WELSH caused SEPTA to issue and mail a check for $4,890 to Blue Zebra as payment for cameras provided under the June 2016 procurement requisition for sixty 3.8 MM color video cameras.

24.    On or about March 10, 2017, defendants JAMES STEVENS and ROBERT WELSH caused SEPTA to issue and mail a check for $9,750 to Blue Zebra as payment for cameras provided under the September 2016 procurement requisition for 300 dome vandal resistant cameras.

25.    On or about September 5, 2017, defendant JAMES STEVENS requested approval for an emergency procurement resulting in defendant ROBERT WELSH and Spector

13

obtaining a "sole source" contract, worth approximately \$277,993, to install cameras and crash-worthy hard drives on SEPTA vehicles ("the Camera and CWHD Project").

  26. On or about October 26, 2017, defendant ROBERT WELSH, on behalf of Spector, signed a contract with SEPTA to complete the Camera and CWHD Project for the price of \$271,430. Defendant JAMES STEVENS was listed on the contract as the Project Manager.

  27. On or about November 23, 2017, defendant JAMES STEVENS approved for payment a Spector invoice for \$6,216 for work performed on the Camera and CWHD Project.

  28. On or about December 18, 2017, defendant JAMES STEVENS approved for payment a Spector invoice for work performed on the Camera and CWHD Project for \$21,312.

  29. On or about January 17, 2018, defendants JAMES STEVENS and ROBERT WELSH caused SEPTA to issue and mail a check for \$53,280 to Spector as payment for work performed on the Camera and CWHD Project.

  30. On or about September 18, 2017, defendant JAMES STEVENS solicited and demanded that defendant ROBERT WELSH hire K.N., an individual working for defendant STEVENS, as a part-time employee of Spector, and presented an employment contract for K. N. to defendant WELSH.

  31. On or about November 2, 2017, defendant JAMES STEVENS approved for payment a Spector invoice for \$106,744 for work performed on the General Maintenance Contract.

14

32.     On or about November 17, 2017, defendants JAMES STEVENS and ROBERT WELSH caused SEPTA to issue and mail a check for $106,744 to Spector as payment for work performed on the General Maintenance Contract.

33.     On or about November 30, 2017, as defendant JAMES STEVENS solicited and demanded, defendant ROBERT WELSH gave defendant STEVENS a check for $1,500, payable to a local restaurant, to help fund an annual office holiday party for SEPTA employees.

34.     On or about December 6, 2017, defendant JAMES STEVENS approved for payment a Spector invoice for $106,744 for work performed on the General Maintenance Contract.

35.     On or about December 20, 2017, defendant JAMES STEVENS and ROBERT WELSH caused SEPTA to issue and mail a check for $106,744 to Spector as payment for work performed on the General Maintenance Contract.

36.     On or about December 21, 2017, defendant JAMES STEVENS approved for payment a Spector invoice for $106,744 for work performed on the General Maintenance Contract.

37.     On or about January 19, 2018, defendants JAMES STEVENS and ROBERT WELSH caused SEPTA to issue a check for $106,744 to Spector as payment for work performed on the General Maintenance Contract.

38.     On or about January 30, 2018, defendants JAMES STEVENS and ROBERT WELSH caused SEPTA to issue a check for $6,480 to Spector as payment for cameras provided under the January 26, 2017, requisition for between 80 and 240 3.8 MM color video cameras to be provided over the course of 2017.

15

39.     On or about January 30, 2018, defendant JAMES STEVENS approved for payment a Spector invoice for $106,744 for work performed on the General Maintenance Contract.

40.     On or about February 16, 2018, defendants JAMES STEVENS and ROBERT WELSH caused SEPTA to issue a check for $106,744 to Spector as payment for work performed on the General Maintenance Contract.

41.     On or about March 12, 2018, defendant JAMES STEVENS approved for payment a Spector invoice for $102,690 for work performed on the General Maintenance Contract.

42.     On or about March 20, 2018, defendant JAMES STEVENS helped facilitate defendant ROBERT WELSH entering an "Agreement for the Purchase and Sale of Assets" and a "Contractor Agreement" (collectively, "the Agreements") with Company G. The Agreements provided for Company G to purchase Spector assets for $300,000 and to employ defendant WELSH as the Director of Business Development for one year at a salary of $66,000.

43.     On or about March 22, 2018, defendants JAMES STEVENS and ROBERT WELSH caused SEPTA to issue a check for $102,690 to Spector as payment for work performed on the General Maintenance Contract.

44.     On or about April 13, 2018, defendant JAMES STEVENS approved for payment a Spector invoice for $107,955 for work performed on the General Maintenance Contract.

45.     On or about April 18, 2018, defendants JAMES STEVENS and ROBERT WELSH caused SEPTA to issue a check for $107,955 to Spector as payment for work performed on the General Maintenance Contract.

46.     On or about May 22, 2018, defendant JAMES STEVENS assisted

defendant ROBERT WELSH in preparing a cost proposal for "80 portable live-video system

kits" that defendant WELSH was planning to formally submit to SEPTA and defendant

STEVENS.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

### (Federal Program Bribery-Soliciting)

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 9 and 11 through 21, and Overt Acts 1 through 46 of Count One of this indictment are incorporated here.

2. From on or about November 2, 2017, through in or about July 2018, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

### JAMES STEVENS,
### a/k/a "Ark Royal,"

an agent of SEPTA, an organization, and an agency of a state government, which in the one-year period from July 1, 2017, to June 30, 2018, received annual benefits in excess of \$10,000, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited, demanded, accepted, and agreed to accept things of value, intending to be influenced and rewarded in connection with the business, transaction, and series of transactions of SEPTA involving something of value of \$5,000 or more, namely, defendant STEVENS solicited, demanded, accepted, and agreed to accept cash, payments for a SEPTA holiday party, and other things of value from defendant ROBERT WELSH, intending to be influenced and rewarded for maintaining the SEPTA General Maintenance Contract for defendant WELSH and Spector, and awarding other contracts to defendant WELSH and his companies, including Spector and Blue Zebra.

In violation of Title 18, United States Code, Section 666(a)(1)(B).

18

## COUNT THREE

### (Federal Program Bribery-Offering)

## THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs 1 through 9 and 11 through 21, and Overt Acts 1 through 46

Count One of this indictment are incorporated here.

2. From on or about November 2, 2017, through in or about July 2018, in

Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

## ROBERT WELSH

corruptly gave, offered to give, and agreed to give, things of value, including cash and payments

for a SEPTA holiday party, to defendant JAMES STEVENS, an agent of SEPTA, which in the

one-year period from July 1, 2017, to June 30, 2018, received annual benefits in excess of

$10,000 under federal programs involving grants, contracts, subsidies, loans, guarantees, and

other forms of federal assistance, with the intent to influence and reward defendant STEVENS in

connection with the business, transaction, and series of transactions of SEPTA involving

something of value of $5,000 or more, that is, maintaining the SEPTA General Maintenance

Contract for defendant WELSH and Spector, and awarding other contracts to defendant WELSH

and his companies, including Spector and Blue Zebra.

In violation of Title 18, United States Code, Section 666(a)(2).

## COUNT FOUR

### (Extortion)

### THE GRAND JURY FURTHER CHARGES THAT:

1.      Paragraphs 1 through 9 and 11 through 21, and Overt Acts 1 through 46 of

Count One of this indictment are incorporated here.

2.      From on or about November 2, 2017, through in or about July 2018, in the

Eastern District of Pennsylvania and elsewhere, defendant

### JAMES STEVENS,
### a/k/a "Ark Royal,"

obstructed, delayed, and affected, and attempted to obstruct, delay, and affect commerce and the

movement of articles and commodities in commerce by extortion, as those terms are defined in

Title 18, United States Code, Section 1951, that is, defendant STEVENS while an official and

employee of SEPTA, under color of official right, obtained, and attempted to obtain, from

defendant ROBERT WELSH, property, that is, cash, payments for a holiday party, and other

things of value, with the consent of defendant WELSH.

In violation of Title 18, United States Code, Section 1951(a), (b)(2).

## COUNTS FIVE through SIXTEEN

### (Honest Services Mail Fraud)

### THE GRAND JURY FURTHER CHARGES THAT:

1.      Paragraphs 1 through 9 and 11 through 21, and Overt Acts 1 through 46 of

Count One of this indictment are incorporated here.

2.      From in or about March 2014 until in or about July 2018, in Philadelphia,

in the Eastern District of Pennsylvania, and elsewhere, defendants

### JAMES STEVENS,
### a/k/a "Ark Royal," and
### ROBERT WELSH

knowingly devised and participated in a scheme and artifice to defraud and deprive SEPTA and

the citizens of the Commonwealth of Pennsylvania of their right to the honest services of

defendant STEVENS, through bribery; that is, defendant STEVENS performed, withheld, and

influenced official acts to maintain the SEPTA General Maintenance Contract for defendant

WELSH and Spector, and award other contracts to defendant WELSH and his companies,

including Spector and Blue Zebra, in exchange and in return for things of value from defendant

WELSH.

3.      On or about the dates below, in the Eastern District of Pennsylvania and

elsewhere, for the purpose of executing the scheme described above, defendants JAMES

STEVENS and ROBERT WELSH knowingly caused to be sent and delivered by United States

Mail and any private and commercial interstate carrier, according to the directions thereon, the

following items, each mailing constituting a separate count:

21

| Count | Date (On or About) | Description of Mailing |
|---|---|---|
| 5 | November 17, 2017 | Check from SEPTA for $106,744.00 sent via U.S. Mail from Philadelphia, Pennsylvania, to Spector in Wilmington, Delaware, for payment of invoice relating to General Maintenance Contract. |
| 6 | December 6, 2017 | Check from SEPTA for $19,980.00 sent via U.S. Mail from Philadelphia, Pennsylvania to Spector in Wilmington, Delaware, for payment of invoice relating to PO S895632 (Sub El & CWHD). |
| 7 | December 20, 2017 | Check from SEPTA for $106,744.00 sent via U.S. Mail from Philadelphia, Pennsylvania, to Spector in Wilmington, Delaware, for payment of invoice relating to General Maintenance Contract. |
| 8 | January 5, 2018 | Check from SEPTA for $11,988.00 sent via U.S. Mail from Philadelphia, Pennsylvania, to Spector in Wilmington, Delaware, for payment of invoice relating to PO S895632 (Sub El & CWHD). |
| 9 | January 17, 2018 | Check from SEPTA for $53,280.00 sent via U.S. Mail from Philadelphia, Pennsylvania, to Spector in Wilmington, Delaware, for payment of invoice relating to PO S895632 (Sub El & CWHD). |
| 10 | January 19, 2018 | Check from SEPTA for $106,744.00 sent via U.S. Mail from Philadelphia, Pennsylvania, to Spector in Wilmington, Delaware, for payment of invoice relating to General Maintenance Contract. |
| 11 | January 23, 2018 | Check from SEPTA for $6,480.00 sent via U.S. Mail from Philadelphia, Pennsylvania, to Spector in Wilmington, Delaware, for payment of invoice relating to PO B004938 (BZ Cameras). |
| 12 | January 25, 2018 | Check from SEPTA for $4,884.00 sent via U.S. Mail from Philadelphia, Pennsylvania, to Spector in Wilmington, Delaware, for payment of invoice relating to PO S895632 (Sub El & CWHD). |
| 13 | January 30, 2018 | Check from SEPTA for $6,480.00 sent via U.S. Mail from Philadelphia, Pennsylvania, to Spector in Wilmington, Delaware, for payment of invoice relating to PO B004938 (BZ Cameras). |
| 14 | February 16, 2018 | Check from SEPTA for $106,744.00 sent via U.S. Mail from Philadelphia, Pennsylvania, to Spector in Wilmington, Delaware, for payment of invoice relating to General Maintenance Contract. |
| 15 | March 22, 2018 | Check from SEPTA for $102,690.00 sent via U.S. Mail from Philadelphia, Pennsylvania, to Spector in Wilmington, Delaware, for payment of invoice relating to General Maintenance Contract. |
| 16 | April 18, 2018 | Check from SEPTA for $107,955.00 sent via U.S. Mail from Philadelphia, Pennsylvania, to Spector in Wilmington, Delaware, for payment of invoice relating to General Maintenance Contract. |

All in violation of Title 18, United States Code, Sections 1341 and 1346.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.       As a result of the violations of Title 18, United States Code, Sections

666(a)(1)(B), 666(a)(2), 1341, 1346, and 1951, or a conspiracy to commit such offenses, as set

forth in this indictment, defendants

**JAMES STEVENS,**
**a/k/a "Ark Royal," and**
**ROBERT WELSH**

shall forfeit to the United States of America any property, real or personal, that constitutes or is

derived from proceeds traceable to the commission of such violations.

2.       If any of the property subject to forfeiture, as a result of any act or

omission of the defendants:

          (a)       cannot be located upon the exercise of due diligence;

          (b)       has been transferred or sold to, or deposited with, a third party;

          (c)       has been placed beyond the jurisdiction of the Court;

          (d)       has been substantially diminished in value; or

          (e)       has been commingled with other property which cannot be divided

                  without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant(s) up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United

States Code, Section 981(a)(1)(C).

**A TRUE BILL:**

**GRAND JURY FOREPERSON**

**JACQUELINE C. ROMERO**
**UNITED STATES ATTORNEY**

24